# IN THE COURT OF APPEALS OF IOWA

---

No. 25-0104
Filed May 13, 2026

---

**Shawn Davis,**
Applicant–Appellant,
v.
**State of Iowa,**
Respondent–Appellee.

---

Appeal from the Iowa District Court for Polk County,
The Honorable Michael D. Huppert, Judge.

---

**AFFIRMED**

---

Austin Jungblut of Parrish Kruidenier, L.L.P., Des Moines,
attorney for appellant.

Brenna Bird, Attorney General, and David Banta, Assistant Attorney
General, attorneys for appellee.

---

Considered without oral argument
by Badding, P.J., Sandy, J., and Vogel, S.J.
Opinion by Badding, P.J.

**BADDING, Presiding Judge.**

After a night of drinking with family, Shawn Davis stabbed and killed his youngest brother—Preston Davis. At his jury trial for first-degree murder, Shawn raised a justification defense. He alternatively argued that "this was a crime of passion and it's voluntary manslaughter rather than murder." The jury rejected both arguments and found Shawn guilty of second-degree murder. We affirmed that conviction on direct appeal. *See State v. Davis*, No. 19-0929, 2021 WL 616148, at *1 (Iowa Ct. App. Feb. 17, 2021).

Shawn applied for postconviction relief and claimed that trial counsel was ineffective for failing to call witnesses to testify about his brother's "violent and aggressive behavior while intoxicated." The district court rejected this claim and dismissed Shawn's application, concluding that he failed to "establish[] he was prejudiced by not having this character evidence placed before the jury." Shawn appeals.

## I.    Background Facts and Proceedings

In our opinion on direct appeal, we outlined the facts leading to Shawn's conviction:

> In the early morning hours of August 5, 2017, after a night of partying with extended family, Shawn and his brother, Preston, had a physical altercation [at Shawn's house]. Verbal bickering ramped up to Shawn punching Preston in the face and Preston then throwing Shawn to the ground. A third brother, Damon, pulled Preston off of Shawn. When Shawn got up off the ground, he went into his house, grabbed a knife, went back outside waving the knife over his head, and rushed toward Preston. The three brothers had a brief scramble for the knife, but Shawn retained it, stabbing at Preston and chasing Preston as he ran away. Preston ran through Shawn's backyard and jumped a fence. He collapsed in the neighbor's yard. Shawn turned around, went back into the house, and told

2

a cousin she ought to call the paramedics because "Preston is bleeding out." Shawn then went into the basement, stripped down to his underwear and socks, threw his clothes into the washing machine, and took a shower.

Police responded to dispatch about a stabbing and arrived at Shawn's residence about 4:00 a.m. The first officer at the scene encountered Preston's wife, Crysteal, standing in the yard. She told the officer her husband needed medical attention. When asked who had stabbed her husband, she stated it was a "friend." The officer asked if the person was still at the scene. Crysteal hesitantly told them he was in the house. Shawn was standing in the kitchen. He was cooperative when ordered to the ground and placed in handcuffs. Officers "cleared" the house. Shawn denied knowing anything about what was happening in his back yard. He later stated his two brothers were fighting outside and he had gone out and tried to break it up. Police found a bloody knife with a seven-inch blade in the kitchen sink.

When emergency responders arrived they found Preston unresponsive. An autopsy found three puncture wounds—two to the top of Preston's right shoulder that were not serious, but the third wound had severed an artery, vein, and nerve bundle in Preston's left arm, which resulted in a severe loss of blood and death.

*Id.*

Providing more context to the fight, Crysteal testified at the criminal trial that although Preston and Shawn had a good relationship, they could "have their differences." She explained that both were "very direct-type people," who did not "sugarcoat anything." Although they "got along more than they disagreed," Crysteal had seen them argue before. But their arguments were never physical until the night Preston died. Crysteal—who was outside with the brothers when they were fighting—testified that after Shawn punched Preston in the mouth, Preston "looked at him, shook his head, and attempted to turn around." She had "[n]ever seen him walk away from anything" before. But as Preston was turning, Shawn charged at him. Crysteal said that Preston charged back and pinned Shawn to the ground. A

cousin who witnessed the fight testified that when Preston was on top of Shawn, he kept telling Shawn "he better be glad that he is his blood."

Damon testified that after he pulled Preston off Shawn, he had never seen Shawn so mad. Although Damon testified that he had been more focused on Preston, he believed that Shawn must have gone into the house while Preston and Crysteal were walking down the driveway to their car. A cousin testified that when Shawn came into the kitchen, he grabbed a knife. She talked him into giving her that knife but then he got a bigger one and went back outside. Damon testified that when Shawn came out of the house, he was holding a knife over his head and saying, "What's up? What's up?" like he wanted to fight. Shawn ran toward Preston and Damon. All three brothers scrambled for the knife until Shawn "got it loose" and stabbed Preston in the shoulder.

Shawn told a somewhat similar story at his criminal trial, although in his version, Preston was the aggressor. Like Crysteal, Shawn said that he and Preston had a good relationship. But he also said that Preston "had a way of saying little stuff" and would "just be slick," especially when he was drinking. Shawn testified Preston was acting that way the night of their fight and "agitating" him. Both started "get[ting] heated" and "disrespecting each other" while they were smoking cigarettes with Crysteal outside. Shawn testified that as their argument escalated, Preston came toward him aggressively. Feeling threatened, Shawn punched him in the face. Shawn testified that Preston slammed him to the ground and started choking him. He described this as "uncharted territory" because although he and Preston had verbal disagreements, they had never physically fought before. Shawn testified that he thought Preston wanted to kill him, and so he went into the house and grabbed a knife to scare Preston away. But when he went outside,

Shawn said, Damon and Preston seized him. Shawn testified that the three brothers wrestled with the knife and that Preston must have been stabbed during the scuffle.

In his closing argument at the criminal trial, defense counsel emphasized the relationship between Shawn and Preston: "They had a good brother-to-brother relationship. There's no question about it, that they got along. And whatever happened here was completely out of character for both of them and it got out of hand." Against the backdrop of that loving relationship, counsel argued that if the jury did not believe that Shawn acted in self-defense, then they should only convict him of voluntary manslaughter. In support of that argument, counsel insisted this was "a crime of irresistible passion between two brothers who got into an argument that escalated and then got out of hand. There was no other reason for Shawn to have wanted to have his brother dead." The jury didn't buy these arguments and instead found Shawn guilty of second-degree murder.

At the hearing on his application for postconviction relief, Shawn complained that his defense attorneys failed "to bring out the dynamics between" him and Preston. While Shawn said they had a good relationship overall, he said it was sometimes toxic when they drank because Preston became sarcastic and condescending. Shawn testified they had several incidents leading up to the stabbing that became "aggressive" and "combative," although never physical. But he testified they "were close several times." According to Shawn, he gave his attorneys a list of witnesses who would have testified about "Preston being very aggressive when he became intoxicated." However, Shawn maintained the attorneys told him that those witnesses—who were not present when Preston was stabbed— were irrelevant.

One of the uncalled witnesses was Joanna Davis, Shawn's wife at the time of the incident. She testified at the postconviction-relief hearing that she had seen Preston act violently before. Joanna explained that Shawn and Preston "always got along until there was drinking involved and then it just seemed to get out of control where [she] would have to ask Preston to leave." She testified that although she saw Preston go after Shawn several times, "they never actually were in a physical fight." But then she contradicted herself and said that she had witnessed them physically fighting. In any event, Joanna testified that she, too, gave Shawn's attorneys a list of witnesses who also would have testified to encounters they "had with Preston due to his nature, his character, especially when he would drink and just his violent, aggressive attitude."

None of these other witnesses testified at the postconviction-relief hearing or provided affidavits to the district court. But Shawn's postconviction-relief counsel argued that if the evidence had been presented, it would have shown "there was an impulsive hot button between these two and I think that tends to negate the mens rea element necessary to convict of second degree murder." The court disagreed, finding that no prejudice resulted from defense counsel's failure to use the list of possible witnesses—assuming one had been given to them.[1] The court reasoned that evidence about the brothers' "contentious relationship" had been presented to the jury through testimony from Crysteal and Shawn. More importantly, according to the court, there was "overwhelming and virtually uncontroverted evidence that Shawn's behavior leading up to Preston's death

---

[1] Neither of Shawn's attorneys remembered being provided a list of witnesses, although they testified that if they had received one, they would have interviewed the witnesses.

was inconsistent with either his claimed defense of justification or actions consistent with voluntary manslaughter."

Shawn appeals, claiming the district court erred in finding he was not prejudiced by the failure to investigate and call character witnesses at trial.

## II. Standard of Review

Postconviction-relief proceedings are ordinarily reviewed for correction of errors at law. *Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021). But when the application raises a constitutional claim, such as ineffective assistance of counsel, we review the proceedings de novo. *Id.*

## III. Analysis

To prevail on a claim of ineffective assistance of counsel, Shawn must establish that (1) counsel failed to perform an essential duty and (2) prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018). We "may consider either the prejudice prong or breach of duty first, and failure to find either one will preclude relief." *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017) (citation omitted). Like the district court, we choose to resolve this case on the prejudice prong.

On appeal, Shawn focuses on the prejudice "as it relates to establishing his actions rose to a level no higher than manslaughter." He claims that because defense counsel failed to present his desired witnesses, the "jury did not have the opportunity to hear a full view of who Preston was." Shawn argues that evidence would have helped to establish the serious provocation needed for the lesser voluntary manslaughter conviction and "assist[ed] the jury in understanding [his] reaction to the provocation." *See* Iowa Code

§ 707.4 (2017) (defining the crime of voluntary manslaughter). The State responds by arguing that no prejudice occurred because the evidence was cumulative and its case was strong.[2] We agree with the State on both points.

As noted by the State and the district court, the jury did hear testimony from Shawn about Preston's quarrelsome behavior when he was drinking:

> And then Preston always has a way—or had a way of saying little stuff. Like he would insinuate or—he would just be slick, especially when he drinks, you know, and he just started doing that and it started an argument.
>
> . . . .
>
> Q. And then tell . . . the jury what happened. A. Well, after Preston made his little comments he made, I said something and one thing led to another and we started arguing.
>
> Q. What was the comment that he made, if you remember? A. About him being the boss and being the honcho and stuff like that. He just—he says stuff like that.
>
> Q. And had he made that statement before? A. No, but he said other things in the past that starts arguments, but that's it.

---

[2] The State also questions whether the evidence would have been admissible, as did the district court in noting that "Shawn never testified that he himself was aware of Preston's tendencies toward violent or aggression when drinking." *See State v. Williams*, 929 N.W.2d 621, 636 (Iowa 2019) (holding "that a defendant asserting self-defense or justification may not prove the victim's aggressive or violent character by specific conduct of the victim *unless* the conduct was previously known to the defendant"). And because Shawn's argument on appeal focuses only on his heat-of-passion defense, we note that this court has found that whether a victim "previously engaged in violent acts does not bear on whether" a murder was "the 'result of [a] sudden, violent, and irresistible passion.'" *State v. Spellman*, No. 13-1670, 2015 WL 799538, at *5 (Iowa Ct. App. Feb. 25, 2015) (quoting Iowa Code § 707.4)). We need not dive into this issue, however, because we agree with the State's other arguments on prejudice.

Crysteal also testified that while it was typical for Shawn and Preston to get into verbal arguments, she had never seen those fights turn physical. She had, however, seen Preston and Damon get into physical fights. Crysteal testified that Preston was "someone that [didn't] take anything from anybody" and that "if someone is going to do something to him, he's going to respond"—like he had in the past with Damon. She said that after Shawn punched Preston in the mouth, it was the "first time ever in the fifteen years [she was] with him that he took anything from anybody, including family."

Joanna and Shawn's general testimony at the postconviction-relief hearing that Preston "was an aggressive and violent person particularly when he was intoxicated" would not have added anything to the testimony that was already before the jury about Preston's character. And the "withholding of cumulative testimony is not a sufficient showing of prejudice." *Schrier v. State*, 347 N.W.2d 657, 664 (Iowa 1984).

Beyond the cumulative nature of the testimony, we agree with the district court that Shawn failed to establish prejudice because of the "overwhelming and virtually uncontroverted evidence that Shawn's behavior leading up to Preston's death was inconsistent with . . . voluntary manslaughter." To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith v. State*, 7 N.W.3d 723, 727 (Iowa 2024) (quoting *Strickland*, 466 U.S. at 694). In other words, "was the likelihood that the omission impacted the trial great enough to 'undermine confidence' in the outcome?" *Gomez v. State*, No. 19-1297, 2021 WL 210759, at *2 (Iowa Ct. App. Jan. 21, 2021).

Given Shawn's conduct on the night of the stabbing, we conclude the answer is no.  As we found on direct appeal,

> There is no evidence Preston approached the house after Shawn went inside.  There is no evidence it was necessary for Shawn to arm himself for protection when Preston was outside and half-way down the driveway.  In addition, Shawn testified he was not afraid when he left the house with the knife.  It was Shawn who approached Preston as he was leaving.

*Davis*, 2021 WL 616148, at *7 (internal citation omitted).  We find no reasonable probability that the omission of evidence about Preston's character from witnesses who were not present the night of the stabbing would have changed the outcome of the trial.

For these reasons, we affirm the district court's denial of Shawn's application for postconviction relief.

**AFFIRMED.**